IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 27, 2015 Session

**STATE OF TENNESSEE v. JOSHUA R. STARNER AND CAITLYN METZ**

**Appeal from the Circuit Court for Montgomery County**
**Nos. 41200170, 41200189     Michael R. Jones, Judge**

_____

**No. M2014-01690-CCA-R3-CD – Filed April 20, 2016**

_____

A Montgomery County jury convicted Defendant Joshua R. Starner of aggravated child abuse, first-degree felony murder committed during the perpetration of aggravated child abuse, aggravated child neglect, first-degree felony murder committed during the perpetration of aggravated child neglect, and aggravated sexual battery.  The jury convicted Defendant Caitlyn Metz of aggravated child abuse, first-degree felony murder committed during the perpetration of aggravated child abuse, aggravated child neglect, first-degree felony murder committed during the perpetration of aggravated child neglect, and facilitation of aggravated sexual battery.  The trial court dismissed both Defendants' sexual battery convictions and merged the felony murder convictions.  The trial court sentenced Defendant Starner to life in prison for the felony murder conviction and fifteen years for each of the remaining two convictions, aggravated child abuse and aggravated child neglect.  The trial court ordered that Defendant Starner's fifteen year sentences run concurrently with each other but consecutively to his life sentence.  The trial court sentenced Defendant Metz to the same sentences but ordered that all her sentences run concurrently.  On appeal, Defendant Starner contends that the evidence is insufficient to sustain his convictions and that the trial court erred when it ordered partial consecutive sentencing.  Defendant Metz contends that the trial court erred when it denied her motion for severance and that the evidence is insufficient to sustain her convictions.  After a thorough review of the record and relevant authorities, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

Sherri Phillips (at trial) and Gregory D. Smith (on appeal), Clarksville, Tennessee, for the appellant, Joshua R. Starner.

Edward DeWerff (at trial) Clarksville, Tennessee, and Patrick T. McNally (on appeal), Nashville, Tennessee, for the appellant Caitlyn Metz.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; John W. Carney, Jr., District Attorney General; and Robert Nash, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the abuse and killing of the twenty-three month old victim. For their role in the victim's abuse and death in 2009, the Montgomery County grand jury indicted both Defendant Starner, the victim's step-father, and Defendant Metz, the victim's mother, for aggravated child abuse, first-degree felony murder committed during the perpetration of aggravated child abuse, and aggravated rape of a child. In 2012, the Montgomery County grand jury issued a superseding indictment that charged the Defendants with aggravated child abuse, first-degree felony murder committed during the perpetration of aggravated child abuse, aggravated child neglect, first-degree felony murder committed during the perpetration of aggravated child neglect, and aggravated rape of a child.

### A. Pretrial Motions

On February 22, 2012, Defendant Metz filed a motion to sever her case from Defendant Starner's case positing that "she d[id] not want any 'spill over.'" At a hearing on the motion to sever, Defendant Metz's counsel informed the trial court that he had filed a motion to sever the cases at Defendant Metz's insistence. He said that he did not know if he had a colorable argument and would not know until he was made aware of Defendant Starner's defense. He said that Defendant Metz had asked him to inform the trial court that she believed that she and Defendant Starner had inconsistent defenses. He said that Defendant Metz believed that Defendant Starner intended to contend that the victim died of natural causes while Defendant Metz intended to contend that Defendant Starner killed the victim and that she did not know anything about the killing. The trial court stated that it could not rule on the severance motion without hearing evidence and declined to rule on the motion. It further noted that different defenses would not necessarily warrant a severance. Counsel for Defendant Metz did not pursue this motion further.

The morning of trial, Defendant Metz's counsel orally raised a *Bruton* issue. The State informed the trial court that both Defendants had given statements and that it

2

intended to introduce them. Defendant Metz's counsel asked the trial court to redact a portion of Defendant Starner's statement where he said "so did she" in response to questioning about whether he spanked the victim. Defendant Metz's counsel also took issue with a portion of Defendant Starner's statement wherein he said that Defendant Metz had penetrated the victim's anus on a prior occasion to treat the victim's constipation. The trial court granted Defendant Metz's motion to redact Defendant Starner's statement.

## B. Trial

At the Defendants' trial on these charges, the parties presented the following evidence: Bridget Harding testified that in February 2009 she was employed with Anderson Real Estate Group working in the front office of an apartment complex. Two other people worked with her, a woman named "Leslie," and the apartment complex owner, Richard Anderson. The Defendants, who were married at this time, were tenants at the apartment complex. Ms. Harding recalled that both Defendants came into her office, which was small, the afternoon of February 6, 2009. No children accompanied the Defendants and, at the time, she had never seen or met their child. Ms. Harding said that she knew that the Defendants had a child, in part because Leslie, who also had a young son, had commented that she thought the Defendants' son was cute.

Ms. Harding testified that the Defendants took possession of their apartment before they moved into the apartment. They had incurred utility bills, and they were coming to the office on February 6 to arrange payment of those bills. Ms. Harding sought approval for the payments from Leslie. While Leslie was considering Ms. Harding's request, Ms. Harding asked the Defendants where "little man" was. The Defendants responded that he was taking a nap in their apartment, and they both expressed how the weather was enjoyable.

During cross-examination, Ms. Harding testified that this was a Friday and that it was the day before the victim's death. She said that Defendant Starner was not wearing an Army uniform at the time that he came to the office.

Richard Anderson testified that he owned the apartment complex where the Defendants resided. He said that he first met the Defendants and their son in January 2009 when they moved into the apartment complex. Mr. Anderson recalled that, at some point, he sold a truck to Defendant Starner. Mr. Anderson said that on February 6, 2009, the Defendants came to the office to pay an electric bill.

Mr. Anderson described the apartment complex layout and the layout of the Defendants' apartment. He said the apartment was a "standard townhouse" and had two

bedrooms upstairs.

Jeffrey Scott Bates, an emergency medical responder with the Montgomery County Emergency Medical Services, testified that he responded to a call that the victim was not breathing on February 7, 2009. Mr. Bates testified that, when he arrived, Defendant Metz was holding the victim who was draped in a blanket and Defendant Starner was "crying and dropping to his knees."

Mr. Bates said that he looked under the blanket to find the victim naked. He escorted the victim and Defendant Metz to the ambulance, took the victim, and placed the victim on the cot in the back of the ambulance. Mr. Bates testified that the child was "almost completely listless" but was making some breathing effort. The breathing effort was "fish breathing or agonal respirations," which he explained as when a child opened its mouth like it was trying to breathe every several seconds and then stopped. Mr. Bates said he could not get any response from the victim.

Mr. Bates said that one of the victim's pupils was completely dilated and the other pupil was sluggish. Mr. Bates intubated the victim and transported him to the hospital. On the way to the hospital, while intubated, the victim began to move in response to painful stimuli such as pinching his toe. Mr. Bates said that the response was "decerebrate posturing," generally meaning that the victim had suffered a deep brain injury.

During cross-examination, Mr. Bates testified that his report of the event stated that Defendant Metz stated that she had just arrived home to find the victim face down on his bed and stable. The report also indicated that, when Mr. Bates arrived, Defendant Starner was on his knees, crying, asking Mr. Bates to "save" the victim.

Patrick Seay, an officer with the Clarksville Police Department, testified that he responded to the 911 call in this case. He arrived at approximately the same time as the ambulance and fire department. Officer Seay said that, when he arrived, he saw Defendant Starner wearing a pair of Army fatigue style pants and not wearing a shirt or shoes. He said that Defendant Metz was located near the apartment, which was down a sidewalk from where Defendant Starner was located. Officer Seay could see that Defendant Metz was carrying something in her arms, but emergency responders went to her right away and took the child.

Officer Seay said that, as this was an ambulance call, he spoke with Defendant Starner only to ascertain what had happened. The officer said that it took a long time for Defendant Starner to stop crying as he was "very upset." Eventually, Defendant Starner told him that Defendant Metz had gone to the commissary to shop and that he was there

4

at the apartment alone with the victim. He was bathing the victim and left the bathroom briefly. Defendant Starner said the victim was playing and splashing in the tub, and he only left the room for a minute or so to get some clothing and a towel for the child. Defendant Starner said that, when he came back into the bathroom, the victim was lifting his head out of the water and coughing and spitting up water.

Officer Seay testified that Defendant Starner said that the victim seemed "okay" when Defendant Starner removed him from the tub. Defendant Starner said that he dried the victim off, dressed him, and laid him in his crib. Defendant Starner said that he stayed in the victim's room for twenty to twenty-five minutes. When the victim seemed to be doing okay, he left the child and went and took a shower. Defendant Starner said that, after he got out of the shower and came back in, the victim appeared to be sleeping peacefully, so he decided to lie down in his own bed and take a nap. He awoke when Defendant Metz screamed that the victim was not breathing, which was when he called 911. Officer Seay said that Defendant Starner did not indicate that the victim had suffered any additional injuries.

Mark Crump, a store director with the Fort Campbell Commissary, identified a receipt from the commissary dated February 7, 2009, at 12:05 p.m. The receipt, entered into evidence, confirmed this date and time and showed purchases totaling $132.26.

Frederick McClintock, an officer with the Clarksville Police Department Special Operations Unit, testified that, on February 7, 2009, he conducted a search of the apartment shared by the Defendants in this case. He took photographs of the apartment, which he showed to the jury. The photographs showed the victim's bed and bedroom and a potty training toilet in the upstairs bathroom. Officer McClintock also identified a video recording that he made of the scene, which he played for the jury.

Randle Likes, a staff physician at Gateway Medical Center emergency department, testified that he treated the victim on February 7, 2009. He recalled that the victim was in "severe distress" when the victim arrived at the emergency room. By the time that Dr. Likes treated the victim, the victim had been intubated with a breathing tube because emergency room personnel believed the victim was going to have difficulty protecting the airway secondary to the other injuries he had received. Dr. Likes said that he attempted to work on the child as quickly as possible so that he could transfer the child to Vanderbilt where better trauma capabilities were available.

Dr. Likes recalled that the victim was not conscious. He said that the victim suffered injuries to his head, his buttocks, and his genitalia. He specifically had "a lot" of swelling, bruising, and marks in his anal region. Dr. Likes testified that he spoke with Defendant Metz, who told him that the victim's bottom was red before she left for the

5

store but that, when she returned, she found him in severe distress.

During cross-examination by Defendant Starner's attorney, Dr. Likes testified Defendant Metz made a point to tell him that she had been gone before discovering the victim in distress.

Brandi Batson, a nurse at Gateway Medical Center at the time of this incident, testified that she was present when the victim was brought to the emergency room. She said that Defendant Metz was approximately fifteen feet away from the victim while the victim was lying in the hospital bed. Ms. Batson said that she asked Defendant Metz where all the marks on the victim had come from, and Defendant Metz "[s]hrugged her shoulders and looked away."

Melanie Suiter Menear, also a nurse at Gateway Medical Center at the time of this incident, recalled that she performed a sexual assault kit on Defendant Starner to gather evidence. She said that she noted that the Defendant had recently showered and shaved his pubic hair, which limited her ability to gather evidence. Ms. Menear said that, when she first encountered Defendant Starner, she found his conversation with her "very inappropriate seeming for the position that [they] were in at th[at] time." She said that his demeanor was different than any other male suspect that she had ever interacted with. During cross-examination by Defendant Starner's counsel, Ms. Menear agreed that she did not know when Defendant Starner shaved or whether that was something that he customarily did.

Gregory Plennons, a pediatric physician with Vanderbilt University Medical Center, testified that he was assigned to the victim's case as part of a care team that rotated calls when a child was admitted with an injury that was suspicious as "nonaccidential." Dr. Plennons recognized photographs of the victim and said that he spoke with Defendant Metz, inquiring about various injuries on the victim's body. Dr. Plennons asked Defendant Metz about the victim's eye injury, and Defendant Metz told him that four or five days before being hospitalized the victim had been "mudding" in a Jeep with Defendant Starner. She said that the victim had been in the front seat with his father and had fallen out of the car and hit his head on the edge of a door.

When Dr. Plennons asked Defendant Metz about the bruises to the victim's bottom, which were reflected in a photograph, Defendant Metz did not provide an explanation. She did tell the doctor that she and Defendant Starner did "spank the boy when he's bad." She said that she thought that the victim "bruised a little bit more than the average two-year-old" and that she mentioned this to a doctor in Oregon.

During cross-examination by Defendant Starner's counsel, Dr. Plennons testified

6

that he did not recall whether Defendant Metz said that she was also present when the victim was injured during the "mudding" incident. Dr. Plennons confirmed that Defendant Metz had told him that she spanked the victim.

Thomas Abramo, a pediatric emergency medicine doctor who was employed at Vanderbilt Children's Medical Center at the time of this incident, testified that he was the Division Director of the pediatric emergency department when the victim was admitted to the hospital. Dr. Abramo testified that, when the victim was transferred to Vanderbilt on February 7, 2009, he was "very sick." He said that the victim was intubated, his vital signs were very critical, and that his symptoms indicated he had significant brain swelling and signs that his brain was causing significant cardiovascular compromise. The victim had obvious bruises and bleeding.

Dr. Abramo testified that he did a full evaluation of the victim's body. He opined that the victim suffered both physical and sexual abuse. He noted that there were injuries to the victim's anal area, penis, and genitalia. He considered the trauma to the genitalia area to be "significant."

During cross-examination by Defendant Starner's counsel, Dr. Abramo testified that his notes indicated that there also appeared to be old bruising marks on the victim. These marks appeared to be more than a day old. Dr. Abramo noted that children suffering brain trauma often presented differently. Some deteriorated immediately and others did not deteriorate for a longer period of time.

Curtis Wushensky, a radiologist at Vanderbilt Medical Center who specialized in the brain and the spine, testified that he read the scan taken of the victim. He said that the victim's brain was "completely swollen" and that there was a lack of separation between the crooks of the gray and white matter. He also observed some blood along the surface of the brain in the subdural space. Dr. Wushensky said that it was impossible to tell how long it had been since the initial trauma, but he estimated that it took six to eight hours for the injury to manifest.

Dr. Wushensky explained that, while the skull of a small child could slightly expand, the skull is very "nonexpansible." He explained that when a brain is injured and starts to swell it has no place to go, so the pressure in the brain will increase. Eventually, if the brain continues to swell, it will be forced through the neck, similar to a tube of toothpaste. Also, the pressure can increase to a point where a person's heart cannot force blood into the brain, and the brain will be starved of blood.

During cross-examination by Defendant Metz's counsel, Dr. Wushensky said that most of the studies of this type of trauma had been conducted on adults and not children.

Dr. Wushensky agreed that he could not say with a medical degree of certainty how long it took for the victim's brain to swell to the condition that he saw in the scan.

During cross-examination by Defendant Starner's counsel, Dr. Wushensky said that the scan was performed at 3:58 p.m. on February 7, 2009, the day the victim was brought to the hospital. Dr. Wushensky agreed that six to eight hours before 3:58 p.m. would have been before 9:00 a.m. The doctor clarified, however, that he could not be certain that it took this long for the brain to swell, stating that the swelling can occur more rapidly in some situations.

Miranda Parker, an employee with Child Protective Services in Clarksville, Tennessee, testified that she was assigned to the victim's case on February 7, 2009. She went to Vanderbilt Children's Hospital in Nashville where she saw and photographed the victim and spoke with Defendant Metz. Ms. Parker identified the photographs that she took of the victim and said that they accurately depicted how he appeared while lying in the hospital.

The photographs showed bruises on the victim's nose and forehead, bruises to his genitalia and his inner thighs, as well as an abrasion near his anus. Other pictures showed bruises on the victim's left ear, which was swollen and red, and bruising to the victim's right eye. Another photograph showed that the victim had bruises all over his buttocks, a bruise to his right lower chin, and bruising around his neck. Another photograph showed that the victim had a bruise on his right ear, which was also reddened. Another photograph showed that the victim's left ring finger was reddened.

Ms. Parker testified that Defendant Metz told her that, when the victim had awoken that morning, she fed him cereal. Defendant Metz said that the victim was potty training so he wore underpants and not a diaper. Defendant Metz told her that she took the victim to use the restroom and that he was whining, so she put him in time out. Defendant Metz told her that the victim "was spanked" several times before she left to go to the grocery store.

Ms. Parker said that Defendant Metz told her that, when Defendant Metz returned from the grocery store, the victim was lying naked face down in his bed. Defendant Metz also told Ms. Parker that the victim had received a spanking on the Tuesday before the Saturday of his hospitalization. She also said that he had fallen out of the Jeep while the Defendants were "mudding" in their Jeep.

During cross-examination by Defendant Starner's attorney, Ms. Parker testified that Defendant Metz told Ms. Parker that she was the parent who had spanked the victim on the Tuesday before his hospitalization and that she had noticed that her spanking him

8

had caused him bruising. Ms. Parker said that she found Defendant Metz's demeanor unusual because Defendant Metz was not crying or visibly upset. Defendant Metz was using her cell phone to send and receive text messages during the interview.

Ms. Parker also noted that, during the interview, she told Defendant Metz that the State may place the victim into foster care, and Defendant Metz responded "great; that's another thing I'll have to deal with." When Ms. Parker asked Defendant Metz if she was from Grants Pass, Oregon, Defendant Metz responded, "[Y]eah, because I'm cool that way."

Ms. Parker said that, at one point, Defendant Metz called the victim's biological father, who apparently had little to do with the victim. Defendant Metz did not ask about the welfare of the victim or his prognosis during the interview. Ms. Parker said that she found Defendant Metz's behavior so odd that she noted it in her report. Ms. Parker said she did not interview or speak with Defendant Starner.

During cross-examination by Defendant Metz's attorney Ms. Parker testified that she spent between one and two hours with Defendant Metz. She agreed that she was not an expert in grief and loss. She agreed that she had previously met individuals who did not react emotionally when grieving.

Neil Phillips, a pediatrician at Grants Pass Clinic in southern Oregon, testified that the victim became his patient after the victim was born on March 7, 2007. Dr. Phillips recalled that the victim was "typical" in that he grew appropriately and had a normal number of colds and ear infections. Dr. Phillips said that the victim had to have tubes placed in his ears because of the number of ear infections he suffered, but the doctor said that this was also not unusual. Dr. Phillips said that, while the victim was in his care, Defendant Metz was unmarried. He said that she was the only one who brought the victim to see him. He said that, during the time he treated the victim, he did not suspect any sort of abuse. He said that Defendant Metz also did not mention any concern that the victim was bruising too easily, and the doctor did not see any indication of such a condition.

Adele Lewis, a forensic pathologist with the Nashville Medical Examiner's Office, testified as an expert in forensic pathology. She said that she performed an autopsy of the victim's body on February 10, 2009. Dr. Lewis determined that the victim's cause of death was multiple blunt force injuries and that the manner of death was homicide.

Dr. Lewis said that she found blunt force injuries "all over" the victim's body. She noted that he had injuries to his head and neck, his chest, his abdomen, his back, his buttocks, his legs, and his right arm. When asked which injuries she considered lethal,

9

she said that "the injuries to his head were the most lethal of those injuries." Dr. Lewis noted that it would take a "significant" amount of force to cause the victim's injuries, force equivalent to a "major car wreck" or a "two or three story fall." Dr. Lewis saw bruising patterns on the victim's head that were consistent with knuckles striking the forehead.

Dr. Lewis said that, as part of the victim's injuries, his brain swelled. The problem with the brain-swelling injury was that there was nowhere for the brain to go when it became swollen because it was confined by the skull. Therefore, the brain would lose blood flow, escape down the spinal cord, and the victim of such an injury would become brain dead.

Dr. Lewis noted that the victim's injuries included bruises to his eyelids. Those injuries led her to look for retinal hemorrhage, or bleeding in the layers inside the back of his eye. The victim had "many, many of those hemorrhages" inside his eyeballs as well as in the nerves that connected his eyeball to his brain. Dr. Lewis said that, while she was not certain, it had been theorized that those injuries were the result of acceleration and deceleration injuries, such as when a child is forcefully shaken. Dr. Lewis said that, in addition to acceleration and deceleration, it was possible these injuries could be the result of the victim's head striking something, considering all of the external bruising to his head.

Dr. Lewis testified that the victim suffered injuries to the right side of his neck. She classified those injuries as "petechial or pinpoint hemorrhages," which most commonly occur when a victim is choked or strangled. Dr. Lewis noted that the victim had redness on his fingertips. She said that this could have been the result of "a lot of things," such as forceful pinching, or from the victim's hand striking an object, or from an object striking the victim's hand. Dr. Lewis said that it would have been a normal response for a twenty-three-month child to try to shield himself from the blows that he received, and the injuries to his fingers were consistent with this. Dr. Lewis identified three bruise marks on the left side of the victim's face. She said that they were consistent with slap or knuckle marks. Dr. Lewis also testified that the victim's left ear was "very swollen and red" and that there was some bruising to the front side of his ear. She said that when she bent the victim's ear back she saw that there was also bruising there as well.

Dr. Lewis identified a photograph of the victim's buttocks, scrotum, and penis. She said that there was bruising to the left side of his scrotum, and "linear or line like bruises to the inside of his thighs." Dr. Lewis said that these injuries were not consistent with falling down. Dr. Lewis identified for the jury innumerable red bruises on the victim's buttocks. Dr. Lewis said that her examination revealed that there was bleeding

10

into the deep soft tissues of the buttocks. This indicated that there was a significant amount of force used to inflict those injuries. Dr. Lewis also determined that the injury to the victim's buttocks was "fresh," meaning that it occurred at around the same time as the other injuries. The buttocks injury was not consistent with a fall. Dr. Lewis said that the victim had a large blue-purple bruise that went all the way around his anus. There was also a small fissure, or small tear, at the edge of his anus. This injury was consistent with the victim's anus being penetrated.

Dr. Lewis opined that a child who sustained injuries as severe as the victim's would have "immediately become symptomatic in some way." These symptoms would have been to the extent that a "normal" person would know that something was wrong with the child. The child would have become unconscious, have had seizures, vomited, or experienced a change in his breathing pattern. Dr. Lewis said that it was difficult for her to estimate a time period in which these injuries occurred, especially since the victim survived in the hospital for a day before going on life support for two more days while awaiting an organ donation.

During cross-examination by Defendant Starner's attorney, Dr. Lewis testified that the victim's body had already been "opened" before she conducted his autopsy. She stated that the victim had been pronounced brain dead, so he was eligible to have his organs removed. As such, the victim's thymus gland, liver, gallbladder, spleen, kidneys, pancreas, and intestines had all been removed before the autopsy, and so she could not test or examine those organs. The doctor who removed the organs, Dr. Becher, consulted with Dr. Lewis during the autopsy. Dr. Becher told Dr. Lewis that he thought this was a case of a shaken child rather than a child who had received a blow injury. Dr. Lewis agreed that, with injuries this significant, one would expect to see a skull fracture if it was a blow injury, but there was no skull fracture.

Dr. Lewis said that it was possible that the victim would have had discoloration to his feet, meaning they could have turned bluish, when he was not getting enough oxygen. Dr. Lewis also agreed that, if the victim were asleep, his symptoms might not be noticeable because it would appear that he was sleeping. The doctor maintained that the victim's symptoms would have been immediate after the injury but said that they would have gradually gotten worse. She agreed it was possible that they would have started out as mild symptoms and then gotten worse.

About the anal injury, Dr. Lewis testified that it was consistent with penetration but that she could not be certain that it was a penetration injury.

During cross-examination by Defendant Metz's counsel, Dr. Lewis testified that Dr. Becher was a specially trained pathologist who specialized in the brain. Dr. Lewis

said that she placed the victim's brain in formaldehyde and then asked Dr. Becher to examine it. Dr. Becher examined only the victim's brain and not the outside of his head. Dr. Lewis said that in a traditional shaken child case the brain shows injury but there is no injury to the outside of the head. Dr. Lewis said that, while the victim's brain was consistent with the brain of a child who had been forcibly shaken, the outside of his head showed external injuries.

Alan Charvis, a homicide detective with the Clarksville Police Department, testified that he interviewed Defendant Metz, who gave him a written statement on the day of the victim's injury. Her statement was admitted into evidence and it reads as follows:

Today I woke up at around 8am. [Defendant Starner] and I became sexual. We had sex for about 10 minutes. Then I went into [the victim's] room to check on him. He was sitting up in his bed. [Defendant Starner] came into the room to see if he had pottyed his underwear. [The victim] hadn't, so I told him to go sit on his potty. [The victim] walked over to his potty opened the lid and sat down.

He peed in the potty and [Defendant Starner] and I sat on his bed while he went to the potty. I said "Good boy!" And [Defendant Starner] said "Ya, and you know what to do when you are done . . . ." Then [Defendant Starner] and I got up and left. We went back into our room for about 5-10 min. Then [Defendant Starner] went downstairs to get some breakfast. I went to check on [the victim] and he was sitting on his potty still shaking his hand all done. So I told him that if he was done going potty he could get up and he knew what to do. So [the victim] stood up, clapped, put the lid down on his potty and I then told him there was one more thing he had to do before he could come down.

I left and went downstairs wearing a towel. I prepared [the victim's] cereal with milk and put it on his highchair tray.

[Defendant Starner] yelled from downstairs to [the victim] to come down and eat. He told [the victim] to walk down the stairs and when [the victim] got downstairs he ran to his highchair and crawled up in it.

I put [the victim's] highchair tray on and he started to scarf down the cereal.

I made some cereal for me and [Defendant Starner] heated up some

homemade leftover pizza from last night. Then we went in the front room and sat on the floor in front of [the victim and] turned on the t.v. and watched "Wild Wild West Tech."

During the show I looked back at [the victim] and he was sitting there chomping on the cereal and watching the t.v. I put my bowl of half eaten cereal aside and [Defedant Starner] put his empty plate aside. He layed down on his side where he was able to see the t.v. I layed on my side where I was able to see the t.v. I put my hand on [Defendant Starner's] arm and rubbed it. Then I put my hand on his leg.

[The victim] continued to sit in his highchair through the rest of the t.v. show. Then once the t.v. show was over I changed the channel. [The victim] was still sitting in his highchair eating and [Defendant Starner] put on a t-shirt shorts and flip flops. He took his truck keys and went out to the truck to get a screwdriver. He opened the front door took off his shoes, and said "now I have to take a s**t!" He got his hair trimmers and went to the downstairs bathroom and sat down on the toilet to take a dump.

While he was doing that he looked at his magazines and proceeded to try and fix his hair trimmers. Once he was done going to the bathroom he came out with the screwdriver and hair trimmer on his hand.

He was tightening the screws on the hair trimmer. I was in the kitchen toasting [the victim] a blueberry pancake from the freezer. [The victim] was still sitting in his highchair eating and I was watching [Defendant Starner] attempt to fix his hair trimmer. Once [the victim's] blueberry pancake was toasted I went and sat it on the highchair tray and walked back into the kitchen where [Defendant Starner] was.

I moved the kitchen rug so it was bare floor. About this time it was 9:20-9:30 a.m.

[Defendant Starner] got the chair from the desk in the kitchen and rolled it over to where I was in between the stove and the sink.

He sat down on it and took off his shirt, handed me the hair trimmers and I turned it on. That is after [Defendant Starner] plugged it in. I [proceeded] to trim [Defendant Starner's] hair until his head was a fuzzy wuzzy look. (very short) Then I turned off the trimmers got the hair out of them or at least some of the hair. [Defendant Starner] said "this is the last

13

time I am going to use these." Then I dusted off some of the hair off his back and he left the kitchen and proceeded upstairs to the upstairs bathroom.

I walked over to [the victim] and unlocked the tray and went and put it in the kitchen on the sink.

Then I went back to where [the victim] was in the highchair and lifted him out. He said "Pee Pee" so I told him to go sit on his potty that was in the downstairs bathroom. He sat down on the potty and went pee. While he was taking a pee I was cleaning up the kitchen. Then [the victim] shook his hand "all done" and I told him if he was done to get up and he knew what to do. So [the victim] stood up shut his potty lid and flushed his potty. I took off his pj shirt because it was all dirty and wet from his spilling the milk all over himself. And I put the shirt on the hamper next to the washer and dryer.

Then I said "let's go upstairs and get you dressed." So [the victim] walked upstairs and I followed behind him turning off the t.v. as I passed by it.

When we arrived upstairs [Defendant Starner] was in the bathroom starting to shave the rest of his head with a 5 blade razor to get a nice bald head.

I took [the victim] to his room and told him to stay in there. Then [Defendant Starner] and I went and took a shower. In the shower I washed my hair and finished shaving most of [Defendant Starner's] head or at least the part I knew he wouldn't be able to reach. The shower lasted about 10 mins. Then I got out and he followed behind me. I gave him the towel I was using to cover up with before and I got a new towel.

I went to see what [the victim] was doing and he said "pee pee" so I told him to go sit on the potty. [The victim] started to whine so [Defendant Starner] came in [the victim's] room from the bathroom while his head was still lathered with shaving cream.

[Defendant Starner] told [the victim] to go to the "[boo]ger corner" (time out corner).

Then [Defendant Starner] left to go back into the bathroom and I

14

went in our bedroom to get dressed I grabbed underwear, jeans and a shirt and went back into [the victim's] room. He started whining again so I spanked him not hard. Then I got dressed and stood in [the victim's] room.

I asked [Defendant Starner] to hand me my hairbrush and he handed it to me. [Defendant Starner] came in with a nice shaved head and asked if he had missed any spots. So I did the last trimming and [the victim] got another spanking by me for whining but not hard. [Defendant Starner] sat down on [the victim's] bed and told him to go stand in front of [Defendant Starner]. [Defendant Starner] and I told [the victim] that he was there for whining & crying.

While [the victim] hung out in his room, [Defendant Starner] and I went in our bedroom. [Defendant Starner] layed down in the bed and I got my hair piece and went in the bathroom and put my hair back.

Then I went back to the bedroom, went to my closet and got a sweater out put the sweater on and complained about my pants not fitting right now, because of my stomach.

I started to leave the bedroom and he said "where's my good bye kiss sweety?"

I kissed him goodbye.

Then I went in [the victim's] room and kissed [the victim] good bye and went downstairs. I picked up my purse, keys and put my shoes on. As I headed out the door I said "I love you baby" and shut the door behind me.

When I left [the victim's] but[t] was red a light bruise [and] his feet had a little discoloration, but I thought that was from him locking his knees.

It took me 20 mins-25 mins to get to Fort Campbell and another 5-10 mins to get to the commissary. I did the shopping I needed to do and checked out at 12:05 p.m. Then I brought the groceries to my car and left to go to class six which is right next to the commissary. I walked in got a pack of Budweiser and checked out.

I walked to my car and put the beer in my trunk and left. I then drove home which took another 20-25 mins.

15

I tried to call [Defendant Starner] 4 times to let him know I was on the way home. He didn't answer.

When I got home I took my purse [and] keys and locked the door, opened the front door and set down my stuff.

I walked upstairs to say I was back and to get help with the groceries. [Defendant Starner] was laying down in bed and he had just began to wake up. I went into [the victim's] room and I said his name and he didn't answer. I called his name again but louder and he didn't answer. I attempted to move him by moving his body and it was limp. His right eye was open and his left eye was shut but stuff was coming out of his eye. He wasn't breathing much.

He was sleeping on his stomach. I picked him up and began to cry. I screamed "O S**t!" and [Defendant Starner] came running in say[ing] "What! What!" I said, "[the victim's name]!" And I told him to get my purse and keys and walked quickly downstairs. [Defendant Starner] said "I am naked!" and quickly ran downstairs. He said "my son! He's not breathing, get here quick! Hurry! Help!" then said goodbye to the person on the phone. I was sitting on the bottom step holding [the victim] crying trying to talk to him.

I told [Defendant Starner] to get me a blanket for him and then after [Defendant Starner] handed me a blanket he put on his ACU pants and kept checking outside for the ambulance.

Then he said that they were there and I walked outside with my son with a blanket around him to the ambulance.

The detectives asked Defendant Metz if Defendant Starner had ever lost his temper with the victim, and she responded "No if [Defendant Starner] ever g[ets] upset he will go mudding or go somewhere in the house away from both of us to think and collect himself." She was also asked if Defendant Starner had ever hit or spanked the victim. She responded "No, he has only spanked [the victim] with his hand, never using any objects or weapons."

Detective Charvis testified that, during his interview with Defendant Metz, she appeared "more worried about [Defendant Starner] than she was [about] anything [else]." He said that she repeatedly asked to know what was going on with Defendant Starner and she did not ask about the victim until toward the end of the interview.

16

The detective identified a statement that Defendant Metz later wrote at the District Attorney's Office three years after this killing. Detective Charvis read it to the jury, and it largely comported with the statement that she had given to him. The statement differed in that Defendant Metz said that she called Defendant Starner fourteen times while at the grocery store. It also differed in that she said that, after she found the victim listless in bed and Defendant Starner came into the room, she asked him "what the hell happened?" She said that Defendant Starner responded that he did not know. Defendant Metz also said in her second statement that Defendant Starner told the 911 operator that he "loved [his] son, please help" and that he began to cry as she brought the victim downstairs. Defendant Metz said that Defendant Starner kept running outside looking for the ambulance while she rocked the victim, telling him that he was not alone, that Mommy was there, and that she loved him. Defendant Metz said that, when emergency personnel loaded her limp son on the ambulance bed, she sat "bawling" her eyes out.

Detective Charvis said that he subpoenaed Defendant Metz's phone records. They showed that Defendant Metz had called Defendant Starner at 10:38 a.m, 10:47 a.m., 11:00 a.m., and 11:56 a.m. Her receipt showed that she checked out of the commissary at 12:05 p.m. She then called Defendant Starner at 12:14 p.m., 12:18 p.m., and 12:34 p.m.

Detective Charvis testified that he interviewed Defendant Starner twice on February 7, 2009, and that he cried throughout the interviews. During the first interview, Defendant Starner said that he had put the victim in time out and had given the victim a "couple of swats" for whining that day. He described them as "light." Defendant Starner described the victim as a "smart boy" but said that they were "just trying to work on him."

During the interview, Defendant Starner said that Defendant Metz left and went to the store. He said she was gone approximately two hours. Defendant Starner said that, while she was gone, Defendant Starner took the victim out of the corner and talked to him for "thirty minutes" telling him what he had done wrong. Defendant Starner then took the victim to the potty because he was using sign language to express that he had to urinate. The victim did not use the potty, so Defendant Starner said he decided to give the victim a bath because he was dirty from eating breakfast. Defendant Starner put bubbles in the bath, and he recalled that the victim was "happy as ever," asking where his mama was. Defendant Starner said that he went to get the victim pajamas for his naptime, which was around noon, and he was going to lay him down to sleep. Defendant Starner said that, as he came back into the bathroom, he saw the victim "like lifting himself up from being like underwater." Defendant Starner noted that the victim was "smart as hell" and "really independent."

Defendant Starner told Detective Charvis that, when the victim lifted his head from underwater, he was coughing but not whining or crying. Defendant Starner picked up the victim and tapped him and he coughed a little bit. Defendant Starner said he dried the victim off and laid him in bed. Defendant Starner said he stayed with the victim for twenty to twenty-five minutes and allowed the victim to fall asleep. Defendant Starner said that he then went and took a shower, checked on the victim who appeared to be sleeping normally, and then went to take a nap. When Defendant Metz returned, she screamed the victim's name. Defendant Starner knew from the way that she said the victim's name that something was wrong. Defendant Starner described how he went to the victim's room and tried to revive him. He said that the victim was "totally limp" but was breathing and had a heartbeat, so he and Defendant Metz were confused about his condition. He said that they immediately called 911.

Defendant Starner opined that the victim's injuries were a result of the victim slipping in the bath. He said he was only gone from the bathroom for a minute or a minute and a half. Defendant Starner asked to see the victim.

Detective Charvis reminded Defendant Starner that the interview was being recorded and asked Defendant Starner to tell the truth. He reminded Defendant Starner that the victim suffered bruises and knots on his head and bruises on his buttocks. Defendant Starner opined that the bruises on the victim's buttocks were a result of his learning to pull up his underwear or because he had been falling out of Defendant Starner's truck. He said that the victim's bottom would get red from their spankings but said that they were not "like hard spankings." He noted that the spankings would "go up in numbers" if the victim kept "being bad and won't stop."

Detective Charvis said, "So how do you explain . . . a lick on his head . . . [and] that his eyes were all messed up." Defendant Starner said he did not know. Detective Charvis told Defendant Starner that either Defendant Starner or Defendant Metz had done something to the victim. Defendant Starner said that the victim had fallen "out of [his] truck so many times, it's all right. Boys are able to you know, boys got to be boys. You know how it is, when you grew up? You would fall down, you know, hurt your head?" Defendant Starner said that he had never hurt the victim. He expressed frustration at not knowing how the victim was doing or how Defendant Metz was handling the situation. Defendant Starner said that he did not see Defedant Metz hurt the victim in any way and only saw her give him some spankings. He agreed that no one else had control over the victim other than himself and Defendant Metz.

In a second interview, about thirty minutes later, Detective Charvis informed Defendant Starner that the victim was still alive and that the doctors were running tests to try to find out what happened to the victim. Detective Charvis informed Defendant

Starner that there was a "slap mark" on the victim's face and asked how that occurred. Defendant Starner informed Detective Charvis that it was not "a slap mark" and that the detective would have to "ask [the victim]" how he got the mark. Detective Charvis informed Defendant Starner that the victim's anus had been penetrated. Defendant Starner said that the victim's anus had never been penetrated and that he was "tired of [Detective Charvis] attacking him."

During cross-examination by Defendant Starner's counsel, Detective Charvis said that Defendant Starner cooperated with him fully during the interview. He said that Defendant Metz did not appear upset or cry while she was writing out her eighteen page statement. She did not ask about the victim until toward the end of the statement, and she did not seem concerned about him. Detective Charvis agreed that Defendant Starner did appear upset when he gave his statement and also asked to see the victim on multiple occasions. He agreed that he did not see any pictures of groceries in the crime scene photos.

Detective Charvis testified that the police collected items from the Defendants' residence. Some of those items, a shirt, a pipe, a rag, paper towels, and swabs from firearms, were sent to the Tennessee Bureau of Investigation ("TBI") for testing. A rape kit performed on Defendant Starner was also sent to the TBI for testing, along with sheets and blankets.

During cross-examination by Defendant Metz's counsel, Detective Charvis testified that it was not important to his investigation whether the Defendants' groceries had come into the home or were left in the car. He said that a suspect crying in his presence did not mean that they were genuinely upset.

Defendant Starner recalled Ms. Batson, who added that, while Defendant Metz was at the hospital with the victim, Defendant Metz remained about fifteen feet from the bed, never going over to the bed, touching her child, or crying. Ms. Batson said that Defendant Metz never expressed concern about what was wrong with the victim.

Defendant Starner's counsel then read a portion of the medical records into the record. It stated:

> I spoke with the Nursing Staff at bedside this morning, who reported [Defendant Metz] continues to have a flat affect.
>
> . . . .
>
> [Defendant Metz] asked for how she could get a copy of the

19

patient's medical records for herself. [Defendant Metz] said she knew the case was going to Court and all she wanted was to have a copy. I provided the [Defendant Metz] with the number to the medical records here and encouraged her to call after one week so the draft documents could be signed off.

. . . .

[Defendant Metz] asked if I knew how she could get rid of the family truck and other belongings. The mother said she knew that they would need to sell things, so she wasn't sure how to go about this. We talked about her posting signs in the buildings on post and putting an ad in the paper.

Defendant Metz's attorney also presented a portion of the medical records from Vanderbilt. That record indicated that Defendant Metz was "grieving appropriately during this time evidenced by her crying, holding the [victim's] hand and writing the [victim] a good bye letter. [Defendant Metz] met with the Chaplain as well."

The jury convicted Defendant Starner of aggravated child abuse, first-degree felony murder committed during the perpetration of aggravated child abuse, aggravated child neglect, first-degree felony murder committed during the perpetration of aggravated child neglect, and aggravated sexual battery. It convicted Defendant Metz of aggravated child abuse, first-degree felony murder committed during the perpetration of aggravated child abuse, aggravated child neglect, first-degree felony murder committed during the perpetration of aggravated child neglect, and facilitation of aggravated sexual battery.

**B. Sentencing**

At the sentencing hearing, the trial court informed the parties that it was setting aside the guilty verdict with regard to the aggravated sexual battery because, unlike the indicted charge of child rape, it requires that the touching be intentional for the purpose of sexual arousal and there was no evidence presented that either Defendant experienced sexual arousal. The trial court also merged each of the Defendants' two murder convictions into one murder conviction for each Defendant.

Defendant Starner offered evidence that he had attended Bible College and Seminary since he had been in custody. He then offered the testimony of Reverend Daryl Heartstock, who had met Defendant Starner through a bible study at the county jail. Reverend Heartstock said that Defendant Starner had participated in the bible study for two-and-a-half years and that, during that period of time, he had seen Defendant Starner

approximately once per week. The reverend said that Defendant Starner had accepted Christ, and, since doing so, had changed his life. Reverend Heartstock said that Defendant Starner had helped other prisoners, obtained a Bachelor's degree, and had made "[v]ery good" grades.

Defendant Starner made the following statement:

Your Honor, as I stand before this Honorable Court this day I express that my life has not been the same since I – [the victim] passed away. No other time in my life have I experienced such a traumatic event as losing [the victim]. No words can properly express the overwhelming great grief I experienced for many months following [the victim's] death. And while it might be argued by some, the truth is that I loved [the victim] and that he loved me.

The Lord is my witness as I stand before this Court I would have done anything to bring back [the victim] to life. [The victim] was my world and my joy. Many people, Your Honor, people who have worked at that jail, who were there when I first got there who can testify to this fact that for months and months I grieved. Often they took me to suicide watch because they find me crying – find me crying with pictures that I had that were of [the victim]. We have – I know [my attorney] would have it because I gave it to Ms. Wall, but there's a picture of me and [the victim] together, and you can tell that that picture has been worn and handled so much and cried over.

While it might be deemed unwise to some however I will continue to uphold the truth of my innocence and the events surrounding the death of [the victim]. To beg for mercy by convening a false testimony to which an admission of guilt is provided to this Court in hopes of obtaining a lesser sentence would be perjury, a crime against truth, and especially a sin against God.

I, like King David, will continue to faithfully uphold my cause to the Lord and rely upon his timing and vindication of his servant. I will continue to hope in him his purpose and his love and his grace. I do not hold any ill will towards this respectable and honorable Court of which you preside, Judge Jones, and faithfully serve with a fairness I respect, however, in regards to this conviction I recognize the authority and sovereignty of God the Father, the Lord Jesus Christ and the Holy Spirit in bringing fulfillment of this conviction, not on any guilty of my part, but that I may

21

go to prison and faithfully carry out the commission to which God has called me, and to which I have officially been ordained by the church. And that commission is to tell others of God's love and purpose found manifested in the life, death and resurrection of Jesus Christ and his faithfully and infallibly proclaimed in the holy bible that is God's holy word.

I know that the time will come when we stand before God to give account for our lives. I shall be faithfully vindicated for all of this tragedy at that time. If, however, the Lord Almighty desires – he may in his sovereignty bring to pass my vindication within another judicial court, however, until that time I will faithfully continue to trust submit to God's will as he has revealed to me by Revelation.

Furthermore, it is common practice of the United States court system to take into account the life of the defendant between the time of the crime and the date of sentencing as seen in the example of a person sent by the court's orders to a drug rehabilitation institution in such a case in which an individual has successfully experienced rehabilitation and completed the programs required by the Court, and to which witnesses involved may testify to this aforementioned success, the Court takes into serious consideration the facts of this achievement and the testimonies when deciding the sentence to be imposed upon the individual.

Defendant Starner went on to verbosely ask for leniency, noting his rehabilitation and transformation based upon the "work of God and his sanctifying spirit." He noted that he had a near 4.0 GPA for two Bachelor's degrees and that he was twelve credits into his Master's degree. He stated that he had also been ordained, a position that he used to minister to fellow inmates. Defendant Starner testified that he had also attended many bible correspondence classes. He noted that he was a "changed person from who I . . . once was in the Army prior to my arrest." Defendant Starner also asked that the trial court show Defendant Metz mercy when sentencing her.

Defendant Metz also made a statement on her own behalf, stating:

What happened to [the victim] is beyond horrifying. As a mother and as an individual the constant emotional pain to know a child was taken away too soon and to know that that child was my son is constantly there every day. Every day since the day I lost [the victim,] my precious son, who was my entire world, I have asked people to please bring [the victim] back to me here on earth. With the shock I was enduring I didn't realize no one is able

22

to make my request happen.

Every day the pictures replay in my head of how [the victim] looked when I got home from the store and found [him]. Every day my mind replays me constantly asking the nurses and the doctors if I can hold my [the victim] only to get the response: I'm sorry you can't due to all the wires and tubes but you can hold his hand. Every day I remember the hope I held onto in the hospital from every time I saw [the victim's] hand twitch. I had the hope that maybe he could get better, and then for me to tell the doctor – for the doctor to say it's involuntary, there's no brain . . . function.

Every day my mind replays me holding [the victim's] hand and the doctor performing the last test and then pronouncing [the victim] dead. And the emotional pain and sadness I experienced in that hospital I still feel today. [The victim] is now a part of my world and will forever be.

I was 21 and naïve and still learning the parenting world. I have made mistakes in my life as I'm not perfect, none of us are. My mistake was marrying too soon and not taking my time to get to know [Defendant Starner] first. We were married seven weeks total, and four of those weeks were spent here in Clarksville. I have never harmed any of my three kids, and I never would, and I never will. My kids mean more to me than anyone or anything. . . . I am a loving mother and my kids mean more to me than everything.

I may have been a weak person but never was I a bad mother. I was young and never did I think my mistakes would end this way. This is how my life works: Everything surrounds my kids; from the decisions I make to the hobbies I enjoy to the type of food I eat, everything revolves around my kids.

When I chose to get married to [Defendant Starner] I did it because I loved [the victim]. I wanted [the victim] to have an upbringing like I was truly blessed to have, a two parent household full of love and happiness. Two parents working together to try to provide many opportunities while [the victim]'s needs were getting met as well. That's what I wanted for [the victim]. I wanted [the victim] to know that just because [his] biological dad and I weren't together that he could still have a mom and dad who loved him just as much.

. . . I knew there would be some adjustments like [the victim] not

23

seeing his biological dad anymore, and [the victim] seeing me in a relationship. And I thought some counseling would help once we got settled, but I never thought in any of my thoughts, understandings, briefs or the[] way I thought it worked did I ever think that anyone was capable of hurting a toddler as innocent, lovable, happy and outgoing as [the victim] was, who was perfect in my eyes. I love [the victim] more than everything, and I miss him every single day. There's not a day that doesn't pass that I don't think of him and wish I could change what happened in the past and bring him back to me.

Based upon this evidence, the trial court sentenced the Defendants, stating:

I'm going to start with [Defendant] Starner first. Under 40-35-210 . . . based on the . . . 2009 book, which I believe is exactly what it was before. Compare that. In determining a specific sentence the Court has certain things to follow. The appropriate range of punishment. There is, the felony murder case, only one sentence that's possible, and that is life. He'll be sentenced to life on that.

Now, in . . . the aggravated child neglect there's a range of punishment of 15 to 25 years as a range one offender. In determining a specific sentence and the appropriate combination of sentencing alternatives the Court should consider, one, the evidence received at the trial and the evidence, of course, today; the presentence report, which I have reviewed; the principals of sentencing and arguments as to sentencing alternatives; four is the nature and characteristics of the criminal conduct involved; the evidence and information offered by the parties on the mitigating and enhancement[] factors; and I have, certainly, reviewed these letters and all of these exhibits; the statistical information provided by the Administrative Office of the Court. The Court has reviewed that during the sentencing hearing. Both [Defendant] Starner and [Defendant] Metz have made statements that the Court will also consider.

In imposing a specific sentence within the range the Court shall consider but is not bound by the following advisory sentencing guidelines: One, the minimum sentence within the range is the sentence that should be imposed because the General Assembly set the minimum length of sentence for each felony case to reflect the relative seriousness of each criminal offense in the felony classifications, and the sentence length within the range should be adjusted as appropriate by the presence or absence of mitigating and enhancement factors.

Under 40-35-113 the Court has been unable to find any of those factors, mitigating factors, under one through 12, however, under 13 [Defendant] Starner has provided some mitigating, as far as what he has been doing in jail since his arrest now five years ago, and the Court will consider that on those two counts.

As far as enhancement factors . . . this is an aggravated child abuse. Let me look at that. Which requires serious bodily injury. So I don't believe number six could apply; it's already part of the offense. I believe it's also part of the offense under then about no hesitation about committing a crime when the risk to human life was high. I'm not going to find that there are any enhancement factors.

The real concern . . . I'm going to sentence him to 15 years, this is at a hundred percent. The real question in this case in the Court's mind is whether these should be consecutive or concurrent. Under 40-35-115 there are several factors that the Court should consider in determining whether or not to run cases consecutively. The Court may order sentences to run consecutively if the Court finds by a preponderance of the evidence that, one, the defendant is a professional criminal; there has been no showing of that.

The defendant is an offender whose record of criminal activity is extensive; there has been no showing of any prior criminal activity.

Under three, the defendant is a dangerous, mentally abnormal person so declared by a competent psychiatrist; we do not have that.

Four is the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high.

Now, under that the Court also has to determine whether an extended sentence is necessary to protect the public from further criminal conduct by [ ] Defendant [Starner] and . . . that these consecutive sentences reasonably relate to the severity of the offenses committed. It's impossible for this Court to determine that there . . . could be any more severe offenses than what this Court heard in the trial of this matter.

I'm going to determine that, based on the evidence that I heard in the

25

case as well as today, an extended sentence is necessary to protect the public against further criminal conduct by [Defendant] Starner and that the consecutive sentences related reasonably to the severity of the offenses that he committed, so that under subsection four he is a dangerous offender whose behavior indicated absolutely no regard for human life and no hesitation about committing a crime in which the risk to human life was high.

So it will be a sentence of 15 years as to the aggravated child abuse, 15 years to the aggravated child neglect; those two will be concurrent, however, they are consecutive to the life sentence for felony murder.

Now as to [Defendant] Metz, the Court has to consider the same factors that I just read in the statute. The range of punishment is the same. There's a lot of evidence presented; some difference that the Court believes is important in sentencing, some that is not any different.

I will be considering the evidence received at the trial as well as the sentencing hearing, the presentence report, the principles of sentencing and arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct involved, the evidence and information offered by the parties on the mitigating and enhancement factors. As I said, I have reviewed the statistical information; I will, of course, consider the statement made by [Defendant Metz]; I will also be . . . determining the specific sentence within the range, those advisory guidelines.

So I'm going to determine that there are mitigating factors as I have read in these letters. I'm not going to find that there is any enhancement factors. I'm going to sentence her to 15 years on those counts, life on the felony murder.

Now, under 40-35-115, again, [Defendant] Metz has no prior criminal history, so one and two are not applicable under subsection B. Had no determination by a psychiatrist. Four, the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime at which the risk to human life is high. Under these factors that I went over, four, extended sentence is necessary to protect the public against further criminal conduct by [ ] Defendant Metz and consecutive sentences . . . reasonably relate to the severity of the offenses committed.

Based on the letters that I have received, particularly that of Ms. Thatcher, I'm not able to find that . . . it is necessary to protect the public against further criminal conduct by [ ] Defendant Metz. So I'm going to order that 15-year sentences that are concurrent with each other be concurrent with the life sentence imposed in the other case.

It is from these judgments that the Defendants now appeal.

## II. Analysis

On appeal, Defendant Metz contends that the trial court erred when it denied her motion for severance and that the evidence is insufficient to sustain her convictions. Defendant Starner contends that the evidence is insufficient to sustain his convictions and that the trial court erred when it ordered partial consecutive sentencing.

## A. Motion for Severance

Defendant Metz's counsel moved for a severance pretrial, saying that his client had asked him to do so on the basis that she believed that she and Defendant Starner had inconsistent defenses. Counsel noted that Defendant Metz intended to assert that Defendant Starner killed the victim, and Defendant Starner intended to assert that the child died of natural causes. The trial court reserved ruling, and Defendant Metz's counsel did not pursue the motion. During opening statements, the attorneys for Defendant Metz and Defendant Starner each told the jury that the evidence would show that the other had committed the killing. Defendant Starner's attorney told the jury that Defendant Metz had left her house on the morning of the killing because she knew that something was wrong with the victim and she wanted to cast blame on Defendant Starner. Defendant Starner's attorney argued, and pursued a theory during cross-examination, that Defendant Metz's lack of emotion when the victim was in the hospital was evidence of her guilt. During closing argument, Defendant Starner's attorney again asserted that Defendant Metz "planned this." Defendant Metz's attorney argued that Defendant Starner had beaten the victim without Defendant Metz's knowledge.

The first issue we must address is whether Defendant Metz has waived her right to a severance because she abandoned that motion before trial and because she failed to include it in her motion for a new trial. We first note that several matters must be raised prior to trial. *See State v. Cameron*, 909 S.W.2d 836, 853 (Tenn. Crim. App. 1995). Failure to present the severance motion before trial amounts to waiver of the issue. *Id.* (citing *State v. Eldridge*, 749 S.W.2d 756, 757 (Tenn. Crim. App. 1988)). Furthermore when a defendant fails to pursue a pretrial motion or obtain a ruling on the motion, the motion is abandoned. *See State v. Banks*, 271 S.W.3d 90, 170 (Tenn. 2008) (citing Tenn.

27

R. App. P. 36(a) in finding that a motion to suppress was abandoned where a defendant failed to obtain a ruling). Motions for severance can be abandoned for tactical or strategic reasons, and this Court has affirmed that strategy in some cases on appeal. *See e.g., Mayhew v. State*, No. W2013-00973-CCA-R3-PC, 2014 WL 1101987, at *8 (Tenn. Crim. App., at Jackson, Mar. 19, 2014) (stating, "Thus, trial counsel's decision to forgo a severance motion was objectively reasonable, and such decision did not prejudice the Petitioner."). In this case, in a joint trial, Defendant Metz's attorney was able to cast blame on Defendant Starner, who was present at trial. Defendant Metz argued that she was not present when these injuries occurred, noting that Defendant Starner agreed that the victim was acting normally when she left the house and that the medical expert said that the victim would have suffered behavioral changes after suffering such extensive injuries.

With regard to waiver, the State notes that Defendant Metz did not include this issue in her motion for new trial. Initially, we note that Defendant Metz failed to raise this issue in her motion for new trial or during her hearing on the motion. Therefore, she has waived the issue. *See* Tenn. R. App. P. Rule 3(e) (stating that "no issue presented for review shall be predicated upon . . . action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial"). Pursuant to Rule 3(e), "the failure to file a motion for a new trial, the late filing of a motion for a new trial, and the failure to include an issue in a motion for a new trial results in waiver of all issues which, if found to be meritorious, would result in the granting of a new trial." *State v. Keel,* 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994) (footnote omitted). The waiver provision of Rule 3(e), however, does not apply when the issue, if found to be meritorious, would result in the dismissal of the prosecution against the accused. *State v. Debra L. Heath*, No. E2014-00555-CCA-R3-CD, 2015 WL 4554292, at *2 (Tenn. Crim. App., at Knoxville, July 28, 2015), *no Tenn. R. App. P. 11 application filed*. If this issue is found to be meritorious, the case would be remanded for a new trial and not dismissed, so the waiver of Rule 3(e) does apply. We may still, however, review this issue for plain error.

Our Supreme Court formally adopted this Court's *Adkisson* test for reviewing claims of plain error:

> The Court of Criminal Appeals has developed five factors to consider when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely

28

affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.' "

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn.Crim.App.1994)). To rise to the level of "plain error," an error "'must [have been] of such a great magnitude that it probably changed the outcome of the trial.'" *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)). All five factors must be established by the record before a court will find plain error. *Smith*, 24 S.W.3d at 282. Complete consideration of all the factors is not necessary when clearly at least one of the factors cannot be established by the record.

We turn to address the second factor of our plain error review, namely whether a clear and unequivocal rule of law has been breached. The law on a motion for severance includes that "[t]he grant or denial of a motion for severance of defendants is a matter that rests within the sound discretion of the trial court, and [the reviewing court] will not disturb the trial court's ruling absent clear abuse of that discretion." *State v. Dotson*, 254 S.W.3d 378, 390 (Tenn. 2008) (citing *Hunter v. State*, 440 S.W.2d 1, 6 (Tenn. 1969); *State v. Burton*, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988)). "The test is whether or not the defendant was clearly prejudiced in his defense by being jointly tried with his codefendant." *State v. Howell*, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000) (citing *State v. Wiseman*, 643 S.W.2d 354 (Tenn. Crim. App. 1982)); *see also Dotson*, 254 S.W.3d at 390 ("The test to be applied . . . in determining whether the trial court abused its discretion is whether the [d]efendant was 'clearly prejudiced.'" (quoting *Hunter*, 440 S.W.2d at 6)). "The record must demonstrate that 'the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty' before an accused is entitled to a reversal of his conviction." *Burton*, 751 S.W.2d at 447 (quoting *Hunter*, 440 S.W.2d at 6); *see also State v. Price*, 46 S.W.3d 785, 803 (Tenn. Crim. App. 2000).

Rule 8 of the Tennessee Rules of Criminal Procedure provides that "[a]n indictment, presentment, or information may charge two or more defendants . . . if each of the defendants is charged with accountability for each offense included." Tenn. R. Crim. P. 8(c)(1). If the defendant's motion for severance is based upon a co-defendant's out-of-court statement which "makes reference to the defendant but is not admissible against the defendant," the trial court must first determine if the State plans to offer the statement into evidence at trial. Tenn. R. Crim. P. 14(c)(1). If the State does so intend, it must choose one of the following:

> (A) a joint trial at which the statement is not admitted in evidence or at which, if admitted, the statement would not constitute error;

29

(B) a joint trial at which the statement is admitted in evidence only after all references to the moving defendant have been deleted and if the redacted confession will not prejudice the moving defendant; or

(C) severance of the moving defendant.

*Id*.  A defendant may also seek severance on the basis that it is necessary "to promote a fair determination of the guilt or innocence of one or more defendants."  Tenn. R. Crim. P. 14(c)(2)(A).

The provisions of Rule 14(c)(1)(B) can be at odds with the completeness rule, which provides that, if the State introduces into evidence only a portion of the defendant's confession at trial, the defendant "is normally entitled to prove the whole of what was said in order for the jury to be able to weigh the whole statement" unless the confession "involv[es] a non-testifying co-defendant." *Denton v. State*, 945 S.W.2d 793, 801 (Tenn. Crim. App. 1996) (citing *Curry v. State*, 397 S.W.2d 179 (Tenn. 1965); *State v. Brett Patterson*, No. 88-245-III (Tenn. Crim. App, Nashville, Dec. 8, 1989), *perm. app. denied* (Tenn. Mar. 5, 1990)).  "To hold otherwise would be to render impossible the use of a redacted statement in joint trials involving a *Bruton* situation." *Denton*, 945 S.W.2d at 801.  In *Bruton v. United States*, the Supreme Court held that admission of a statement of a non-testifying co-defendant which incriminates the complaining defendant violates the complaining defendant's constitutional right of confrontation.  *Bruton v. United States*, 391 U.S. 123, 126 (1968); *see* U.S. Const. amend. VI; Tenn. Const. art. 1, § 9; *Smart v. State*, 544 S.W.2d 109, 111-12 (Tenn. Crim. App. 1976).  The use of a redacted statement is acceptable, provided the redaction does not alter the substance of the statement or remove information that is substantially exculpatory.  *Denton*, 945 S.W.2d at 801-02; *see also* Tenn. R. Crim. P. 14(c)(1)(B).

The mere fact that there may be more damaging proof against one defendant, as opposed to the other, does not require a severance.  *State v. Rosalind Marie Johnson and Donna Yvette McCoy*, No. E1999-02468-CCA-R3-CD, 2000 WL 1278158, at *4 (Tenn. Crim. App., at Knoxville, Sept. 11, 2000) (citing *State v. Meeks,* 867 S.W.2d 361, 369 (Tenn. Crim. App. 1993)), *perm. app. denied* (Tenn. Apr. 9, 2001).  Further, "the speculative risk of a spill-over effect" does not justify a conclusion that a joint trial was an abuse of discretion. *Id.*  Furthermore,

> [w]hile "mutually antagonistic" defenses may mandate severance in some circumstances, they are not prejudicial per se." *State v. Farmer, et al.,* No. 03C01-9206-CR-00196, 1993 Tenn. Crim. App. LEXIS 420, 1993 WL 247907 ( [Knoxville,] July 8, 1993) citing *Zafiro v. United States,* 506 U.S. 534, 537-38 (1993).  Due to the difficulty in establishing prejudice,

relatively few convictions have been reversed for failure to sever on these grounds. *Id.* Mere attempts to cast the blame on the other will not, standing alone, justify a severance on the grounds that the respective defenses are antagonistic. *Id.* "The defendant must go further and establish that a joint trial will result in 'compelling prejudice,' against which the trial court cannot protect, so that a fair trial cannot be had." *Id.* [(]quoting *United States v. Horton,* 705 F.2d 1414, 1417 (5th Cir.1983)[)].

*State v. Christopher Swift and Marquavious Houston*, No. W2013-00842-CCA-R3CD, 2015 WL 2128782, at *9-10 (Tenn. Crim. App. May 5, 2015) (citing *State v. Ensley,* 956 S.W.2d 502, 509 (Tenn. Crim. App. 1996)), *no Tenn. R. App. P. filed*.

In the case under submission, to grant Defendant Metz relief would require that we find that the trial court abused its discretion and violated a clear and unequivocal rule of law when it reserved ruling on Defendant Metz's motion for severance. The trial court was presented no evidence upon which to base its decision and indicated that it would require evidence to rule on the motion. Because Defendant Metz failed to raise this issue in her motion for new trial, there is similarly no evidence during that hearing regarding this issue. The argument that she presents in her brief is not based upon the evidence presented but rather on the arguments made by Defendant Starner's attorney that his client had not perpetrated this offense, that Defendant Metz's behavior was suspect, and that she acted inappropriately. Defendant Starner's attorney posited that Defendant Metz beat the victim while Defendant Starner was in the shower. The jury was instructed that the arguments of counsel are not evidence and are to be disregarded if not supported by the evidence. *State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008). We presume that the jurors follow their instructions. *State v. Young,* 196 S.W.3d 85, 111 (Tenn. 2006); *State v. Shaw,* 37 S.W.3d 900, 904 (Tenn. 2001).

The evidence presented at trial did include statements by each Defendant. Those statements, however, did not implicate each other, and neither Defendant testified against the other. Both Defendants agreed that the victim was not in the care or control of anyone other than the two of them. Both Defendants indicated that the victim had suffered a fall from a Jeep while "mudding." Both Defendants indicated that the victim was acting normally the day of the killing. Neither Defendant offered any explanation for the victim's injuries other than the bare allegation that they had not caused the injuries and so the other Defendant must have, by implication, caused them. Defendant Starner's statement included one sentence saying that Defendant Metz also "spanked" the victim, but the trial court redacted that sentence from his statement, and it was never heard by the jury.

Given our standard of review, the evidence presented, and the instructions provided the jury, we conclude that plain error review does not require a reversal of Defendant Metz's conviction on this ground. There is no indication that a severance was "necessary to achieve a fair determination of the guilt or innocence of" the Defendants. Tenn. R .Crim. P. 14(c)(2)(ii) (2000). Further, there is no evidence that a severance was required pursuant to Tennessee Rules of Criminal Procedure 14(c)(1), permitting severance of co-defendants where a *Bruton* violation would follow. Defendant Metz is not entitled to relief on this issue.

## A. Sufficiency of the Evidence

Both Defendants challenge the sufficiency of the evidence to support their convictions of aggravated child abuse, aggravated child neglect, and felony murder. They couch several sub-issues within this section. Both Defendants challenge their identity as the one who harmed the victim. They both further contend that the statutory definition of child neglect is unconstitutional because it fails to give proper notice of prohibited conduct. Next, they contend that the indictment was insufficient. Finally, they contend that double jeopardy requires that the conviction for aggravated child abuse and aggravated child neglect be merged or dismissed. The State contends that the evidence was sufficient to establish the elements of the offenses and that the Defendants have failed to establish that they are entitled to relief on any of the other sub-issues.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

"The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In determining the sufficiency of the evidence, this Court should not re-weigh or

reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences that may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

### 1. Sufficiency of Proof of Identity

Both Defendants contend that the evidence is insufficient to sustain their convictions for aggravated child abuse, aggravated child neglect, and felony murder. They both dispute the sufficiency of the proof that they committed the offense. Both Defendants note that there are five possible scenarios from the State's proof, namely that: (1) both Defendants injured the victim; (2) Defendant Starner injured the victim with Defendant Metz's knowledge; (3) Defendant Starner injured the victim without Defendant Metz's knowledge; (4) Defendant Metz injured the victim with Defendant Starner's knowledge; or (5) Defendant Metz injured the victim without Defendant Starner's knowledge. The Defendants assert that the evidence showed Defendants

Starner and Metz were the only two people with the victim but that a jury may not guess at options for the course of events to reach a verdict. Both Defendants contend that the evidence did not prove that they participated in the actions that led to the victim's death, noting that mere presence at a crime scene is not enough to show guilt. Neither Defendant challenges the sufficiency of the evidence as to the elements of the relevant convictions, rather they each take issue with the sufficiency of proof regarding their identity as a perpetrator of the offenses.

The identity of the perpetrator is "an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Identity may be established with circumstantial evidence alone, and the "jury decides the weight to be given to circumstantial evidence, and [t]he inferences to be drawn from such evidence . . . ." *Id.* (internal quotation marks omitted). The question of identity is a question of fact left to the trier of fact to resolve. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

The jury, by its verdict, found both Defendant Metz and Defendant Starner culpable for the victim's death. Therefore, it did not conclude that the crime was committed without either Defendant Metz or Defendant Starner's knowledge. The jury was instructed on the theory of criminal responsibility for another. The trial court instructed the jury that a person may be criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense. By its verdict the jury concluded that both Defendants were criminally responsible for the victim's death.

This Court, deciding a case in which a child was nearly killed in the care of his two caregivers, held that "a jury does not need to determine unanimously whether a defendant is either directly liable or criminally responsible for the harm inflicted in a case not involving multiple occurrences of the offense." *See State v. Darrell F. Nunn Sr. and Jamila Nunn*, No. E2007-02333-CCA-R3-CD, 2009 WL 4790211, at \*25 (Tenn. Crim. App., at Knoxville, Dec. 14, 2009) (citing *State v. Lemacks*, 996 S.W.2d 166, 170–71 (Tenn.1999), *perm. app. denied* (Tenn. Mar. 12, 2010). The Court further found that "the jury was instructed on criminal responsibility for each Defendant, thereby including several theories of guilt." *Id.* (citing *Lemacks*, 996 S.W.2d at 170 (stating that "criminal responsibility is not a separate, distinct crime" but rather "a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person"). *See also State v. Erica D. Goodner and Troy Allen Goodner*, No E2007-01048-CCA-R3-CD, 2009 WL 605141, at \*18-22 (Tenn. Crim. App., at Knoxville, Mar. 10, 2009) (finding that the evidence was sufficient to sustain convictions for co-defendants stemming from infant death while in the care of both defendants), *perm. app. denied* (Tenn. Aug. 17, 2009).

While not contested by either Defendant, we further conclude that the evidence is sufficient to sustain the elements of their convictions.  The Defendants were convicted of felony murder perpetrated during the commission of aggravated child abuse, aggravated child abuse, and aggravated child neglect.  Aggravated child abuse occurs when the accused knowingly, other than by accidental means, treats a child under the age of eighteen in such a manner as to inflict injury and the act of abuse results in serious bodily injury to the child.  T.C.A. § 39-15-401(a)(2014); § 39-15-402(a)(1) (2014).

A person commits child neglect when that person "knowingly abuses or neglects a child under eighteen (18) years of age so as to adversely affect the child's health and welfare[.]"  T.C.A. § 39-15-401(b) (2014).  As charged in the indictment, "[a] person commits the offense of . . . aggravated child neglect . . . who commits . . . child neglect, as defined in § 39-15-401(b) . . . and: (1)[t]he act of . . . neglect . . . results in serious bodily injury to the child."  T.C.A. § 39-15-402(a)(1) (2014).

"Serious bodily injury" means bodily injury that involves:

(A) A substantial risk of death;

(B) Protracted unconsciousness;

(C) Extreme physical pain;

(D) Protracted or obvious disfigurement;

(E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or

(F) A broken bone of a child who is twelve (12) years of age or less;.

T.C.A. § 39-11-106 (34) (2014).

Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first-degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, or aircraft piracy."  T.C.A. § 39-13-202(a)(2) (2014)

In this case the evidence, viewed in the light most favorable to the State, showed that, while the victim was in the sole care and custody of the Defendants, the victim suffered numerous non-accidental injuries.  He died from multiple blunt force injuries

35

sustained all over his body. He suffered significant brain injury, notably fluid was draining from one of his eyes. His body showed signs of his having been strangled, his anus penetrated, a bruised scrotum, and severe bruising to his bottom. Defendant Metz agreed that she spanked the victim but insisted that it was "not hard." Multiple witnesses to her behavior after she called 911 reported that she expressed no emotion. She did not go near the victim in the small emergency room. During questioning by the police, Defendant Metz did not inquire about the health status of the victim. During questioning by child services, Defendant Metz did not appear upset, spent time texting on her phone, and expressed frustration that the victim might have to go to foster care if he survived. She also inquired about selling her possessions.

While Defendant Metz was gone for some period of time the day of the killing, the jury by its verdict accredited the testimony of Dr. Wushensky, the radiologist reviewing the victim's brain scan, who noted that the victim's brain was completely swollen and that it could have taken six to eight hours for his injuries to completely manifest, placing Defendant Metz at the apartment when the injuries occurred. Further, Dr. Lewis opined that the victim would have been symptomatic immediately after suffering these blows, but the Defendants did not seek medical treatment until after Defendant Metz returned from the store. Defendant Metz called Defendant Starner seven times between the time she left for the store and when she returned, and the jury could have inferred that she knew that something was wrong with the victim when she left and was calling to check on him. Defendant Metz indicated to police that the victim may have hurt himself while falling from a Jeep and said that he bruised easily, something she said that she mentioned to his pediatrician. The victim's pediatrician testified that his notes did not indicate that Defendant Metz had ever mentioned that the victim bruised easily.

Defendant Starner, by all accounts, was present at the apartment with the victim all day on the day of the killing. He told investigating officers that he spanked the child, also stating that it was not a hard spanking. He said that he left the child alone in the tub and then found him coming up from the water. This statement was inconsistent with the injuries sustained by the victim. The jury determined that he was responsible for the killing or criminally responsible for the abuse, neglect and killing. The evidence is sufficient to sustain the Defendants' convictions.

### 2. Constitutionality of Child Neglect Statute

Both Defendants contend that the definition of "abuse" and "neglect" is unclear in the child neglect statute. They note that, according to the definition, a crime occurs when "[a]ny person who knowingly abuses or neglects a child . . . so as to adversely affect the child's health and welfare . . . ." T.C.A. § 39-15-401 (2014). The Defendants argue that this statute fails to provide notice of what is prohibited conduct. The State counters that

neither Defendant raised this issue in their motions for new trial so the issue is waived. The State further avers that the Defendants cannot show plain error.

The State is correct that the Defendants failed to raise this issue in their motions for new trial. Initially, we note that the Defendants' failure to raise this issue in their motion for new trial may result in waiver. *See* Tenn. R. App. P. Rule 3(e) (stating that "no issue presented for review shall be predicated upon . . . action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial"). Pursuant to Rule 3(e), "the failure to file a motion for a new trial, the late filing of a motion for a new trial, and the failure to include an issue in a motion for a new trial results in waiver of all issues which, if found to be meritorious, would result in the granting of a new trial." *State v. Keel*, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994) (footnote omitted). We may still review this issue for plain error.

As previously stated, our Supreme Court formally adopted this Court's *Adkisson* test for reviewing claims of plain error:

> The Court of Criminal Appeals has developed five factors to consider when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.' "

*Smith*, 24 S.W.3d at 282 (quoting *Adkisson*, 899 S.W.2d at 641-42). This Court has previously upheld the child abuse and neglect statute against a vagueness challenge. *See State v. Crank*, 468 S.W.3d 15, 25 (Tenn. 2015) (citing *State v. Prater*, 137 S.W.3d 25, 32 (Tenn. Crim. App. 2003) (finding that the pre-2005 version of Tennessee Code Annotated section 39-15-401 and -402 were not unconstitutionally vague); *State v. Blake Delaney Tallant*, No. E2006-02273-CCA-R3-CD, 2008 WL 115818, at *23 (Tenn. Crim. App. Jan. 14, 2008) (examining the pre-2005 version of the statutes and holding "In light of these holdings, we conclude that the aggravated child abuse and neglect statute is not unconstitutionally vague as applied to the defendant, as the statute was clear and concise and put the defendant on adequate notice of the prohibited conduct."). We conclude, pursuant to our review, that the child abuse and neglect statutes are not unconstitutionally vague. Thus, no clear and unequivocal rule of law has been breached and therefore no plain error exists. The Defendants are not entitled to relief as to this issue.

### 3. Sufficiency of Indictment

The Defendants next challenge the validity of the indictment based upon the fact that the term "neglect" is not adequately or properly defined so as to give them proper notice of the crime committed. Defendant Starner notes that, as relevant, he was charged as follows:

> **Count I (Aggravated Child Abuse)**
> That on the 6th day of February, 2009, and in the State and County aforesaid, Joshua R. Starner . . . unlawfully and knowingly, other than by accidental means, did treat [the victim], a 23-month-old child, in such a manner as to inflict serious bodily injury, in violation of TCA 36-15-402 and against the peace and dignity of the State of Tennessee.
>
> **Count III (Aggravated Child Neglect)**
> And the Grand Jury aforesaid, upon their oath aforesaid, do further present and say that on the date aforesaid, and in the State and County aforesaid, Joshua R. Starner . . . did unlawfully and knowingly did abuse or neglect [the victim] a 23-month-old child, adversely affecting the child's health and welfare in serious bodily injury to said child, in violation of TCA 39-15-402(a)(1) and against the peace and dignity of the State of Tennessee.

The State counters that neither Defendant contested the validity of the indictment pretrial and, as such, this issue is waived.

The United States and the Tennessee Constitutions require that an indictment inform the accused of "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. An indictment satisfies this constitutional requirement "if it provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." *State v. Hill,* 954 S.W.2d 725, 727 (Tenn. 1997). The validity of an indictment is a question of law and, therefore, our review is de novo. *State v. Hill,* 954 S.W.2d 725, 727 (Tenn.1997).

Initially, we note that the Defendants are raising this issue for the first time on appeal. However, because the remedy for an insufficient indictment would be dismissal of the charge, the Defendants did not have to raise the issue in their motions for new trial. *See* Tenn. R. App. P. 3(e) (regarding the waiver of issues not raised in a motion for new trial); *State v. Keel,* 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994) (stating that "[t]he waiver provision of Rule 3(e), however, does not apply when the issue, if found to be meritorious, would result in the dismissal of the prosecution against the accused"). Similarly, the Defendants also did not have to raise the issue before trial pursuant to

Tennessee Rule of Criminal Procedure 12.. *State v. Demeko Gerard Duckworth*, No. M2012-01234-CCA-R3-CD, 2013 WL 1933085 (Tenn. Crim. App., at Nashville, May 10, 2013) (providing that "challenges to the indictment, other than 'a claim that the indictment, presentment, or information fails to show jurisdiction in the court or to charge an offense,' must be raised prior to trial") (quoting Tenn. R. Crim. P. 12(b)). *See State v. Swift*, No. W2013-00842-CCA-R3CD, 2015 WL 2128782, at *17 (Tenn. Crim. App., at Jackson, May 5, 2015). A claim that an indictment is "so defective as to fail to vest jurisdiction in the trial court" may be raised "at any stage of proceeding, including a habeas corpus petition." *Wyatt v. State*, 24 S.W.3d 319, 323 (Tenn. 2000).

A criminal indictment must include a sufficient description of the offense to ensure that the defendant understands the nature of the charge. *Jackson v. Virginia*, 443 U.S. 307, 314 (1979). The essential functions of the indictment are to provide notice of the charge, enable entry of a proper judgment upon conviction, and protect against double jeopardy. *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991). Indictments need not conform to strict pleading requirements. *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997). Historically, strict pleading in indictments was required because offenses existed at common law which did not have elements that were easily ascertainable by reference to a statute. *Id.* at 728. Because such common law offenses no longer exist, to hold on to strict pleading requirements would be embracing "technicalities that are empty and without reason." *Id.* (quoting *State v. Cornellison*, 166 Tenn. 106, 59 S.W.2d 514, 515 (Tenn. 1933)); *see also State v. Hammonds*, 30 S.W.3d 294, 299 (Tenn. 2000). "[W]e now approach 'attacks upon indictments, . . . from the broad and enlightened standpoint of common sense and right reason rather than from the narrow standpoint of petty preciosity, pettifogging, technicality or hair splitting fault finding.'" *Hill*, 954 S.W.2d at 728 (quoting *United States v. Purvis*, 580 F.2d 853, 857 (5th Cir. 1978)).

It has been held that an indictment which references the statute defining the offense is sufficient and satisfies the constitutional and statutory requirements of *Hill*, giving the accused sufficient notice of the charged offense. *See State v. Sledge*, 15 S.W.3d 93, 95 (Tenn. 2000); *State v. Carter*, 988 S.W.2d 145, 149 (Tenn. 1999); *Ruff v. State*, 978 S.W.2d 95, 100 (Tenn. 1998). Additionally, an indictment need not allege the specific theory or means by which the State intends to prove each element of an offense. *See Hammonds*, 30 S.W.3d at 302; *Wyatt v. State*, 24 S.W.3d 319, 324 (Tenn. 2000); *State v. Lemacks*, 996 S.W.2d 166, 172-73 (Tenn. 1999). Indeed, indictments which achieve the overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements. *Hammonds*, 30 S.W.3d at 300.

We conclude that the indictments in this case adequately provided the Defendants notice. The indictments listed the date, time, and place where the offenses occurred, as well as naming the victim and his age. The indictment listed the relevant statutes,

articulated the language of those statutes, and listed the elements of the offenses pursuant to those statutes. The Defendants are not entitled to relief on this issue.

## 4. Double Jeopardy

The Defendants next contend that double jeopardy requires that the conviction for aggravated child abuse and aggravated child neglect merge. The State counters that, pursuant to the post-2005 statutes, child abuse and child neglect are separate offenses with distinct elements. It notes that the Defendants' convictions for child abuse in this case were based upon the beating of the victim and the child neglect was based upon their failure to immediately seek medical attention for the victim.

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." Likewise, the Tennessee Constitution also protects against double jeopardy convictions, providing that "no person shall, for the same offence, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. Three fundamental protections are encompassed in the principle of double jeopardy: "(1) protection against a second prosecution after an acquittal; (2) protection against a second prosecution after conviction; and (3) protection against multiple punishments for the same offense." *State v. Thompson*, 285 S.W.3d 840, 847 (Tenn. 2009) (citations and internal quotation marks omitted). Whether multiple convictions violate double jeopardy is a mixed question of law and fact, which the Court reviews de novo without any presumption of correctness. *State v. Watkins*, 362 S.W.3d 530, 539 (Tenn. 2012).

We cannot agree with the Defendants' contention that they were charged twice for the same conduct and that their convictions violate provisions against double jeopardy. The evidence at trial, in the light most favorable to the State, showed that the victim was beaten the morning of February 7th while both Defendants were home. He would have immediately shown symptoms of his head injury. The Defendants did not seek medical treatment for the victim, and Defendant Metz went to the store while Defendant Starner gave the victim a bath and then placed him in bed naked before falling asleep himself. When Defendant Metz returned, the victim was non-responsive, his brain having swelled continually since the time of the beating. By the time that he was seen by emergency personnel he not responding to external stimuli, not breathing well on his own, and was unable to be saved. We find that these events give rise to two separate and distinct offenses. The beating is the basis for the aggravated child abuse convictions and the failure to seek timely medical treatment for the victim is the basis for the aggravated child neglect convictions. These convictions do not violate double jeopardy, and the Defendants are not entitled to relief.

## B. Sentencing

Defendant Starner next contends that the trial court abused its discretion when it ordered partial consecutive sentencing. Defendant Starner was convicted of aggravated child abuse, a Class A felony, aggravated child neglect, a Class A felony, and felony murder, which in this case includes a mandatory life sentence. The trial court ordered that Defendant Starner be sentenced to fifteen years for each of the Class A felonies, the minimum sentence within the applicable sentencing range, and ordered that those sentences run concurrently with each other but consecutively to Defendant Starner's life sentence. He asserts that the trial court did not have proper grounds to order consecutive sentencing and notes the positive changes that he has made in his life. He further takes issue with the fact that he was sentenced differently than Defendant Metz, who received concurrent sentences. The State counters that the trial court properly ordered consecutive sentences based upon the finding that Defendant Starner was a dangerous offender.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence and the manner of service of that sentence. In *State v. Bise*, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. 380 S.W.3d 682 (Tenn. 2012). The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980).

Thus, the reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the

principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2014); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

Tennessee Code Annotated section 40-35-115(b) (2014) provides that a trial court may order sentences to run consecutively if it finds any one of the statutory criteria by a preponderance of the evidence. As is relevant in this case, the trial court found the following criteria applicable:

> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

T.C.A. § 40-35-115(4). The imposition of consecutive sentencing, however, is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" T.C.A. § 40-35-103(2), (4). In addition to these criteria, "consecutive sentencing is guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed,'" although specific factual findings are not necessary. *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002); *see also* T.C.A. §§ 40-35-102(1), -103(2); *In re Sneed*, 302 S.W.3d 825, 828-29 (Tenn. 2010). We review a trial court's decision to impose consecutive sentences for an abuse of discretion, accompanied by a presumption of reasonableness. *State v. James Allen Pollard*, 432 S.W.3d 851 (Tenn. 2013).

Our Supreme Court has held that "the imposition of consecutive sentences on an offender found to be a dangerous offender requires, in addition to the application of general principles of sentencing, the finding that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d at 939.

In this case we conclude that the trial court did not abuse its discretion when it found that the Defendant Starner was a dangerous offender and imposed partial

consecutive sentencing. While Defendant Metz left the home, Defendant Starner was responsible for the care of the victim. He stated that he gave the victim a bath and placed him in bed. The medical evidence at trial included that, as the victim's brain swelled from the beating, his symptoms would have gradually gotten worse and progressed. Defendant Starner did not seek medical attention for the victim as his symptoms worsened, instead leaving him naked in his bed and falling asleep. By the time that Defendant Metz returned home, the victim's symptoms had progressed to the point that his eye was bulging and draining fluid and he lay unresponsive in his bed. The victim suffered bruises all over his body, including his genitalia, and suffered a severe brain injury. This evidence supports the trial court's finding that the Defendant was a dangerous offender. It further supports that an extended sentence is necessary to protect society from further criminal conduct, and it clearly reasonably relates to the severity of the offenses committed. The trial court considered the relevant principles and sentenced Defendant Starner to a within range sentence. Based on the evidence at trial, the sentence imposed on Defendant Starner was not excessive, and the trial court did not abuse its discretion. Accordingly, we conclude that Defendant Starner is not entitled to relief.

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE